**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

William Baxter

     v.                               Civil No. 07-cv-200-SM

Michael J. Astrue, Commissioner
Social Security Administration

**REPORT AND RECOMMENDATION**

In February 2004, claimant William Baxter filed an application for disability insurance benefits and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act, claiming he had become disabled on January 20, 2002. That application was denied on July 28, 2004, and claimant sought no further review. He filed a second application for social security benefits on October 15, 2005, again claiming January 20, 2002, as the date he first became disabled. Claimant asked the administrative law judge ("ALJ") to reopen the 2004 application, but he refused, finding there was no new, material evidence to justify reconsidering the prior determination. See 20 C.F.R. §§ 404.988 & 416.1488. A hearing on the matter was

held on November 9, 2006, after which the application was granted
in part, based on a disability onset date of January 7, 2005, not
January 20, 2002.  Claimant sought review of that decision by the
Appeals Council, which was denied, rendering it the final
decision of the Commissioner of the Social Security
Administration ("SSA").  Claimant now seeks review of that final
decision to deny his application for disability insurance
benefits for the three years from January 2002, when he alleges
he first became disabled, to January 2005, the disability onset
date determined by the ALJ.  See 42 U.S.C. § 405(g).

Before the court are claimant's Motion for Order Reversing
the Decision of the Commissioner (document no. 8) and Defendant's
Motion for an Order Affirming the Decision of the Commissioner
(document no. 11).  For the reasons that follow, I recommend that
the court deny claimant's motion and grant defendant's motion to
affirm the Commissioner's partial denial of benefits.

I.  BACKGROUND[1]

Claimant has a high school degree and attended college for
two years.  He worked as a carpenter and cabinetmaker in

_____

[1]The facts are taken from the Joint Statement of Material
Facts (document no. 12) and the certified record of the entire
proceedings before the Social Security Administration (referred
to hereinafter as the "CR").

residential construction, but has not engaged in "substantial gainful activity," as that term is defined by 20 C.F.R. § 404.1505(a), since January 28, 2002[2], when, at 41 years of age, he injured his left knee coming down off of a roof at work.  He worked intermittently, between surgeries and post-operative care, as a self-employed carpenter from that date forward until November 2004; however, the record contained no evidence of any earnings for either 2004 or 2005.  According to claimant's earnings' record, he acquired disability insurance coverage through June 30, 2005.  CR at 15, 17.

Following his accident, in February 2002, plaintiff saw Dr. John Bloom, an orthopaedic surgeon, for the swelling and tenderness of his knee.  CR at 153.  X-rays and MRI scanning showed early degenerative changes and tears of the medial meniscus and anterior cruciate ligament.  Dr. Bloom referred claimant to another orthopaedic surgeon, Dr. Peter Buckley, who placed claimant on light duty status until he had surgery to repair his knee.  CR at 154.  Surgery was performed in May 2002.

---

[2]Medical records indicate the injury occurred on or about January 23, 2002, and claimant states January 20, 2002, as the onset date.  This slight variation in dates is immaterial to the disability determination, and so the ALJ's January 28, 2002, date is accepted as the date claimant last engaged in substantially gainful activity that produced any record of earnings.

Although claimant developed some swelling and stiffness, Dr. Buckley released him to return to light duty work.  CR at 160. In July 2002, claimant's swelling had subsided, but he complained of stiffness and pain and exhibited thigh atrophy.  CR at 161. Dr. Buckley noted claimant was doing well but needed to work on his physical therapy.  In August 2002, Dr. Buckley again examined claimant, who still showed some weakness and atrophy but had progressed significantly and retained the ability to do light duty work.[3]  Finally, in October 2002, claimant had no complaints and his examinations were normal, enabling him "to return to full activities without restrictions."  CR at 163.

In January 2003, claimant returned to Dr. Buckley with more swelling and pain to his left knee, after it "popped" when he was getting into bed.  CR at 164.  Dr. Buckley determined that claimant had another medial meniscus tear, and performed surgery in March 2003.  Following surgery, claimant needed both physical therapy and assistive ambulatory aides.  Claimant returned to Dr. Buckley on April 14, 2003, complaining of severe pain laterally and swelling of the knee, which was primarily caused by the use

---

[3]Notes from this office visit state claimant complained of pain "after running several miles"; however, in November 2003, claimant called Dr. Buckley to correct the record to reflect that he had not run since leaving the military several years prior.

4

of stairs.  By May 2003, however, claimant's swelling had subsided, he could walk unassisted, and no longer required pain medication, except occasionally at night.  Claimant was authorized to return to work, but could not kneel or squat.

Throughout the summer of 2003, claimant saw the orthopaedist to monitor his progress.  Although claimant's condition had improved, he began complaining of back pain, caused by his irregular gait, and continued to suffer from pain at night and after prolonged sitting or climbing stairs.  He was diagnosed with possible patellofemoral syndrome.  On October 27, 2003, Dr. Buckley's office completed a "Determination of Incapacity Status" form from the New Hampshire Department of Health and Human Services ("NH-DHHS"), which indicated claimant was incapacitated as of January 8, 2003, due to a left knee injury that was described as "partial permanent impairment."  CR at 285.

In January 2004, claimant returned to Dr. Gregory Andrecyk, a primary care physician, for heart fluttering, and continued in Dr. Andrecyk's care for the remainder of the disputed coverage period.[4]  Claimant reported that he still suffered from left leg and low back pain and was feeling depressed.  He also continued

---

[4]The record reflects Dr. Andrecyk continued as claimant's primary care phsycian until at least August 31, 2006.  CR at 322.

to have trouble with high blood pressure.  Claimant stated that
he had stopped taking his anti-hypertension medication because he
has run out of refills.  In February 2004, claimant saw a
psychologist, who gave him a "clean bill of health."  CR at 177.
Dr. Andrecyk assessed claimant as suffering from chronic low back
pain, hypertension, high blood pressure and obesity, but that his
ambulatory problems stemmed from his knee injuries, not from
pulmonary or cardiac issues.  Dr. Andrecyk prescribed several
medications for claimant's pain and hypertension and to help him
stop smoking.  CR at 181-82.  Dr. Andrecyk also referred claimant
to a pain clinic in March 2004, where he began seeing Dr. James
E. Tobin.  CR at 201.

     Claimant told Dr. Tobin that he had experienced low back
pain since he had been in a motor vehicle accident in 1995.  Id.
He reported that his pain increased after his January 2002 fall,
when he injured his left knee.  Since that injury, claimant had
intermittently suffered from pain in his left lower extremity and
his left ankle.  Id.  Dr. Tobin's examination revealed weakness
in claimant's left foot and difficulties raising his left leg.
He also noted that claimant's lumbar spine was tender on
palpation, particularly on the left side and over both the left

and right lumbar facet areas.  CR at 202.  Dr. Tobin concluded
that claimant was "in moderate distress secondary to his back
pain" and that "sensory exam [was] grossly within normal limits."
CR at 201-02.  In March 2004, the pain clinic administered three
epidural steroid injections in claimant's back, which succeeded
in reducing his symptoms.  CR at 196-200.

   As part of his first application for social security
benefits, claimant had a physical residual functional capacity
assessment ("RFC") done on April 21, 2004.  CR 114-21.  The RFC
form indicated claimant's primary diagnosis as a left knee ACL
tear with reconstructive surgery, and a secondary diagnosis of
"DDD-lumbar spine."  CR at 114.  This assessment found claimant
had minimal exertional restrictions, being able to carry 10-20
pounds, to sit, stand or walk, with normal breaks, for 6 hours of
an 8 hour day, and to push or pull in unlimited amounts.  His
postural limitations were only "occasional," and he had no
manipulative, visual, communicative or environmental limitations.
CR at 115-18.  The examiner found claimant's alleged deficiencies
to be unsupported by the medical evidence.  CR at 119.

   On May 2, 2004, Dr. Andrecyk completed the NH-DHHS form for
"Determination of Incapacity Status" to report that claimant's

chronic low back pain rendered him incapacitated.  CR at 182.
Later that same month, claimant received two nerve blocks to help
alleviate his back and leg pain and raodiofrequency lesioning.
CR at 183, 206–12.  Following those treatments, his back pain was
reduced to only mild, diffuse tenderness.  Claimant's condition
was otherwise fairly stable, with blood pressure and hypertension
both manageable and his psychological condition unchanged.  CR at
183, 206–10.

    In July 2004, a psychologist, Dr. Thomas Lynch, examined
claimant, because his persistent pain was impeding his ability to
sleep and causing him some depression.  CR at 304.  He explained
to Dr. Lynch that his back pain started when he was injured in a
car accident as a child, and was further aggravated in a second
car accident in 1995.[5]  CR at 304–05.  Claimant looked sad and
appeared depressed, but his affect was "appropriate."  CR at 308.
Though claimant showed mild deficits in concentration and short-
term memory, his intelligence and judgment appeared normal and he
had no inclination to harm himself.  Id.  Claimant told Dr. Lynch
he could perform a variety of domestic chores, but was not as

---

    [5]Dr. Lynch's notes reflect the year was 1993, however, the
record otherwise reflects the accident occurred in 1995.  CR at
201, 345, 363.

8

active as he would like and could not pursue hunting, fishing or walking as he had previously.  CR at 308–09.  Dr. Lynch concluded that despite claimant's condition, he could interact appropriately in a work setting and could both remember simple instructions and complete tasks.  Dr. Lynch stated that any problems claimant might have with doing the type of tasks he had always done would be caused by physical limitations from his back and knee problems, not by any mental impairment.  CR at 309.  Finally, Dr. Lynch predicted that given his "good support systems in his environment, his prognosis for the future is fair."  CR at 310.

Following that examination, claimant had a Mental RFC Assessment form completed by William Jamieson, a medical consultant for the SSA.  CR at 286–303.  He evaluated claimant as retaining his mental faculties, with no significant limitations, despite his pain, and being able to maintain a regular work week, performed at a consistent pace without any unusual interruptions or special supervision.  CR at 287–88.  The RFC also assessed claimant as being only mildly limited in his ability to perform daily living activities, maintain social functioning, maintain concentration, persistence or pace, and as having no episodes of

decompensation.  CR at 300.

Also in July 2004, claimant returned to Dr. Tobin to follow up on the pain treatments he had received in May and June.  Dr. Tobin reports that claimant's "shooting" pain in the back and legs had improved, that his gait was slow but with no significant limp, and that he was referred to physical and aquatic therapy. CR at 213.

When claimant returned to Dr. Andrecyk for a routine check-up in September 2004, he reported that he had returned to work as a self-employed carpenter and that he was feeling well.  CR at 185.  Claimant was taking a low-dose of pain control medication. His psychological state was unchanged, and his blood pressure remained slightly elevated.  CR at 185.  Later in September 2004, claimant returned to Dr. Andrecyk complaining of constant, very high levels of back pain, which were only slightly appeased by the pain medication.  Dr. Andrecyk's examination showed claimant suffered from reduced back flexibility and tenderness, but that his lower extremity strength was "adequate."  CR at 186.

Claimant returned to the pain clinic on October 22, 2004 and again on January 6, 2005, for prescription refills.  CR at 214-15.  The treating nurse noted that claimant was "alert and

10

oriented," but she was concerned about his prescription drug use
and intended to discuss that with Dr. Tobin.  By February 2005,
the nurse noted that claimant's pain should decrease and be
manageable if he were to take his medication as prescribed.  Id.
Further treating notes indicate claimant's condition worsened
throughout 2005, but his sleep problems, depression, pain and
blood pressure all continued to respond well to medication.  CR
at 215-25.  Claimant took methadone regularly, and several notes
reflect claimant seeking a prescription refill during this time
period.  Claimant stated that his pain increased on exertion.  CR
at 221.  He received another series of injections from Dr. Tobin
in October 2005, and was advised to continue his prior
medications and avoid strenuous activities.

On January 30, 2006, Dr. S. Stevens, a medical consultant
for the state of New Hampshire, reviewed claimant's medical files
and assessed his physical RFC.  CR at 228-35.  Dr. Stevens'
assessment was similar to the April 2004 RFC assessment, finding
that claimant had reduced exertional capacity, with limitations
on lifting or carrying at 10-20 pounds but unlimited pushing
ability, standing reduced to at least 2 hours and sitting
remaining at 6 hours in an 8 hour workday.  CR at 229.  He was

found to be able to climb, balance, stoop, kneel, crouch and crawl "occassionally," with, again, no manipulative, visual, communicative or environmental limitations.  CR at 230-32.  Dr. Stevens determined that the "MER[6] reasonably supports limiting standing and walking to 5 hours out of 8 hour day," CR at 230, and "mostly supports claimant's allegations."  CR at 233.

In March 2006, claimant was again referred to Dr. Lynch for a psychological evaluation.  CR at 236.  Dr. Lynch concluded that claimant had no severe functional problems caused by depression or other affective disorder, but he also described claimant as "being in a chronic state of adjusting to his condition," and expressly limited his opinion to non-physical impairments.  CR at 241-42.  Dr. Lynch specifically found that claimant "has not found new skills or developed new skills since his back has gotten worse.  His short-term and long-term memory appear to be generally intact at this time.  As a result, he has the ability to learn new information.. . . [T]he extent that his back injury prevents him from keeping up with a routine was beyond the scope of the present evaluation to assess. He does have the ability to interact appropriately with co-workers and supervisors if he was

---

[6]I assume "MER" stands for medical examination records.

in a work setting." CR at 241. At that time, claimant's diagnoses were degenerative disc problems, fibromyalgia, high blood pressure, chronic pain disorder, and chronic adjustment disorder with depressed mood. CR at 241-42.

Also in March 2006, Dr. Carlos A. Palacio, a neurosurgeon, evaluated claimant's low back and leg pain. Dr. Palacio did not find any justifiable basis for surgery at that time, but recommended claimant pursue "aggressive attempts at conservative management" with rehabilitation programs and continued pain management. CR at 263.

Claimant received another RFC assessment in April 2006, to evaluate his ability to work given his diagnosed limitations. CR at 243-60. Claimant was assessed as having a "moderate" degree of limitation in all categories of functioning.[7] The summary conclusions indicate that claimant was either not significantly limited, or occasionally moderately limited, with respect to his mental capacity for (1)understanding and memory and (2) sustained concentration and persistence. CR at 257-58. Claimant was "seen as having relatively good residual function in all areas." CR at

---

[7]The list included (1) restrictions of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence, or pace, and (4) episodes of decompensation. CR at 253.

259.

Dr. Bloom continued to monitor claimant's back and knee problems throughout 2006.  On June 21, 2006, Dr. Tobin completed a questionnaire about claimant's spinal condition and concluded that his combined impairments equaled a severity of Listing § 1.04A.  CR at 353-54.

Finally, on November 1, 2006, claimant was evaluated by Dr. Frank A. Graf, for purposes of his pending application for social security benefits.  CR at 339-51.  Dr. Graf also completed a RFC questionnaire.  Dr. Graf concluded that claimant's depression and anxiety were affecting his physical condition and that he was incapable of working even "low stress" jobs.  CR at 340.  He determined that claimant could not work an eight hour day, could not sit more than 15 minutes or stand more than 10 minutes, could not walk around a city block, and could only rarely lift less than five pounds.  CR at 340-42.  His opinion was claimant could not return to work.  Id.  Dr. Graf stated that the earliest date that the described symptoms and limitations applied was January 20, 2002.  CR at 343.  Based on this evaluation, Dr. Graf opined that claimant's back problems satisfied the disability criteria of Category 1.04, his ambulatory and knee problems satisfied the

14

criteria of Category 1.02A, and his mood disorders satisfied the
criteria of Category 12.04, rendering him "disabled for all
employment," with the disability likely to continue for at least
12 months.  CR at 350.

At the November 9, 2006, hearing, the ALJ questioned the
vocational expert, Maurice Demers, about what jobs claimant could
perform given his functional limitations.  CR at 373.  The ALJ
specifically asked Mr. Demers to assume an individual who needed
sedentary work and required low stress and direct supervision.
Id.  Mr. Demers testified that with claimant's long history of
carpentry work, he could be an estimator or an information clerk,
for which there were several jobs available both in New Hampshire
and nationally.  Id.  When asked about the further restriction of
frequent drowsiness caused by pain medication, Mr. Demers stated
no jobs would be available that could accommodate that
limitation.  Claimant's counsel asked the ALJ whether he would
stipulate that, if Dr. Graf's RFC were accepted, it would also
preclude claimant from obtaining any employment.  CR at 374.
Without committing to Dr. Graf's RFC, the ALJ said he would so
stipulate.  Id.

15

II.  Discussion

**A.  Standard of Review**

Claimant has a right to judicial review of the decision to deny his social security benefits.  See 42 U.S.C. § 405(g) (Supp. 2007).  The court is empowered to affirm, modify, reverse or remand the decision of the Commissioner, based upon the pleadings and transcript of the record.  See id.  The factual findings of the Commissioner shall be conclusive, however, so long as they are supported by "substantial evidence" in the record.  See Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir. 1991) (quoting 42 U.S.C. § 405(g)).

"Substantial evidence" is "'more than a mere scintilla.  It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Currier v. Sec'y of HHS, 612 F.2d 594, 597 (1st Cir. 1980).  The Commissioner is responsible for resolving issues of credibility and drawing inferences from the evidence in the record.  See Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981) (reviewing court must defer to the judgment of the Commissioner).  The issue before the Court is not

16

whether it agrees with the Commissioner's decision, but whether
that decision is supported by substantial evidence.  See id.
Finally, the court must uphold a final decision denying benefits
unless the decision is based on a legal or factual error.
See Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996)
(citing Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

   **B.  Claimant's Arguments**

      1.  Legal Error in Selecting Onset Date

   Claimant first argues the Commissioner's denial of his
application for benefits before January 7, 2005, should be
reversed because it constitutes legal error, citing Manso-Pizarro
v. Sec'y of HHS, 76 F.3d 15 (1st Cir. 1996).  He contends that
because he was not evaluated by an agency physician before June
30, 2005, his last insured date, there was no medical evaluation
of his physical RFC to support the ALJ's conclusion that he
retained the ability to work until January 7, 2005.  As a result,
claimant asserts that the ALJ was required, as a matter of law,
to accept Dr. Graf's RFC assessment that claimant became disabled
in January 2002.  While not entirely clear, the argument seems to
be that the ALJ erroneously based the January 7, 2005, disability
onset date on Dr. Andrecyk's treatment notes and the ALJ's

personal evaluation of the medical records, rather than on expert medical opinion as required by Manso-Pizzaro.  I find this argument unpersuasive.

Manso-Pizzaro stands for the settled proposition that when a claimant puts his functional capacity at issue "the ALJ must measure the claimant's capabilities, and 'to make that measurement, an expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person.'" Id. at 17 (quoting Santiago v. Sec'y of HHS, 944 F.2d 1, 7 (1st Cir. 1991)).  "With few exceptions (not relevant here), an ALJ, as a lay person, is not qualified to interpret raw data in a medical record." Id. (citing Perez v. Sec'y of HHS, 958 F.2d 445, 446 (1st Cir. 1991)).  The ALJ is expected to be guided by a physician's or other expert analysis of the claimant's functional capacity, unless the claimant has such minimal physical impairment that it obviously poses no significant exertional restriction, obviating the need for a medical assessment of RFC. See Manso-Pizarro, 76 F.3d at 17-18; Perez, 958 F.2d at 446-47.

Here, claimant's RFC is at issue, and his problems are sufficiently persistent and diffuse that a medical assessment of

claimant's ability to perform the ordinary tasks of life would be expected.  Claimant's physical and mental impairments also appear to adversely affect one another, further complicating what is a reasonable expectation of his RFC and indicating the need for medical guidance on the issue.  Despite claimant's statement that the ALJ "acknowledg[ed] there was no acceptable medical source who had rendered an opinion regarding the Plaintiff's RFC" and that the April 2004 RFC assessment "was completed by a non-acceptable medical source," Mot. for Order Reversing the Decision at 5 & 6, the record reflects that the ALJ both considered the April 2004 RFC and accepted the medical evidence supporting that assessment.[8]  The record here in fact includes the type of expert medical evaluation of claimant that <u>Manso-Pizarro</u> requires.

The record contains four RFC assessments:  a physical RFC assessment from April 2004, a mental RFC assessment from May 2004, and a second physical and mental RFC assessment done in January and April 2006.  <u>See</u> CR at 114-21 (April 2004 RFC), 286-

---

[8]Although the ALJ denied claimant's request to have the 2004 application reopened because there was no new, material evidence to justify reconsidering the prior determination, the final decision here in fact considered claimant's entire medical record, from the initial January 2002 injury to the November 2006 hearing.  <u>See</u> CR at 15-25.  Accordingly, all the evidence contained in the certified record is subject to review.

303 (May 2004 RFC), 228-35 (January 2006 RFC) and 257-60 (April
2006 RFC).  The May 2004 and the two 2006 RFC assessments were
conducted by medical doctors.  Although the April 2004 physical
RFC assessment was done by a claims adjuster who, as a lay
person, is not qualified to interpret raw medical data, it relied
on the treating physician's medical opinions of claimant's
physical capacity to assess claimant's ability to work.  CR at
115-16.  The May 2004 mental RFC concluded that claimant's mental
health issues did not preclude him from returning to a regular
work week.  CR at 287-300.  The January 2006 physical RFC first
noted a diminished capacity to perform a full work schedule, when
Dr. Stevens concluded "there is no evidence of neurological
deficit," but "RFC takes pain and obesity into consideration.
MER reasonably supports limiting standing and walking to 5 hours
out of 8 hour day."  CR at 229-30.  In April 2006, however, Dr.
Stenslie's mental RFC assessment found claimant was still able to
complete a work day and work week "without undue corruption," and
that claimant's allegations were "only partially credible and not
as substantial in terms of his functional limitations as he
suggests."  CR at 259.

  These four RFC assessments substantiate the ALJ's conclusion

that claimant retained the capacity to perform low stress and
sedentary exertion work activity until January 2005.  Each of the
RFC assessments in the record contain references to the
underlying doctor's evaluation of claimant's physical and mental
health.  This evidence of RFC assessments performed by medical
doctors and based on medical opinions is the type of "expert's
RFC evaluation . . . ordinarily essential" to the ALJ's
measurement of a claimant's capabilities.  Manso-Pizarro, 76 F.3d
at 17.  The record demonstrates that the ALJ was guided by the
reports and analyses of multiple doctors in reaching the January
7, 2005, date.  I find that the ALJ's January 7, 2005, decision
was not an inappropriate judgment by an "unqualified" lay person
based only on raw medical data and does not constitute legal
error.  See id.

        2.  Substantial Evidence

    Claimant next argues that the January 7, 2005, onset date is
not supported by substantial evidence and that, instead, the
record demonstrates that he first became disabled in Janury 2002.
Given the deference with which the record must be reviewed, this
argument is wholly unpersuasive.  Only a few facts bear repeating
to demonstrate claimant retained the ability to work during the

three years from January 2002 to January 2005.

Only four months after his initial January 2002 injury, Dr. Buckley released claimant to light duty work in May 2002.  CR at 160.  From June through August 2002, claimant complained of stiffness, but Dr. Buckley continued to find claimant able to do light duty work and advised claimant to pursue physical therapy. CR at 160-63.  By October 2002, claimant was permitted to resume full activities with no restrictions.  CR at 163.  After injuring his same knee a second time in January 2003, claimant again had surgery and recovery was slower; however, by May 2003, he again was allowed to go back to work provided he did not kneel or squat.  That summer claimant began complaining of back pain.  In October 2003, Dr. Buckley formally identified claimant as having a partial permanent impairment since the January 2003 injury, but did not alter his assessment of claimant's ability to continue working.  CR at 285.

In January 2004, claimant first began seeking care for his heart problems and feelings of depression.  Although these problems continued to plague him throughout the claim period, they were not identified as disabling claimant until at least 2006.  In February 2004, a psychologist gave claimant a "clean

bill of health." CR at 177.  Claimant was also diagnosed with obesity, hypertension, high blood pressure and pain, yet managed all these problems with medications and other treatments.  CR at 181–83, 196–202, 206–12.  The evidence shows that claimant responded well to this treatment, so well that by September 2004 he returned to work as a self-employed carpenter.  CR at 185.  At that time, claimant reported feeling well and needed only low dose pain medications.  Id.  During fall of 2004, the evidence suggests claimant's condition began to deteriorate, as he returned to the pain clinic for prescription refills, and the nurse notes reflect concern about his medication dosage.  On January 7, 2005, Dr. Andrecyk noted claimant appeared distressed. CR at 186.  The ALJ determined that claimant's increase in pain combined with his spine and knee limitations sufficiently impaired his posture, gait and mood to render claimant disabled.

The record is replete with medical evidence that throughout 2002, 2003 and 2004 claimant could have returned to work, but just did not.  Although Dr. Tobin identified claimant as having a permanent partial disability in October 2003, he still authorized claimant to return to his work, with the only restriction being not to kneel or squat.  As late as September 2004, claimant

23

stated he had returned to work as a self-employed carpenter.  The record contains several opinions finding claimant was not credible and that his functional capacity was greater than his alleged limitations.  In making factual findings, the ALJ must weigh the evidence and evaluate credibility, to which the court must defer unless not supported by the record.  See Frustaglia v. Sec'y of HHS, 820 F.2d 192, 195 (1st Cir. 1987).  Based on this record, it was entirely reasonable for the ALJ to decide that claimant did not become disabled until January 7, 2005.  Because that decision is supported by substantial evidence, it is conclusive.  See Ortiz, 955 F.2d at 769.

### Conclusion

For the reasons set forth above, I recommend that claimant's Motion for Order Reversing the Decision of the Commission (document no. 8) be denied, and defendant's Motion for Order Affirming the Decision of the Commissioner (document no. 11) be granted.  Any objections to this report and recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992);

United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).


_James R. Muirhead_
James R. Muirhead
United States Magistrate Judge


Date:     September 5, 2008

cc:       D. Lance Tillinghast, Esq.
          Seth R. Aframe, Esq.